## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| BREANDAN COTTER, individually and on behalf of others similarly situated,<br><br>                    Plaintiff,<br><br>    v.<br><br>CHECKERS DRIVE-IN RESTAURANTS, INC., a Delaware corporation,<br><br>                    Defendant. | Case No. 8:19-cv-01386-VMC-CPT<br>Class Action |

### PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

Plaintiffs Breandan Cotter and Jack Dinh ("Plaintiffs") now respectfully move on an unopposed basis for preliminary approval of a proposed class action settlement with Defendant Checkers Drive-In Restaurants, Inc. ("Defendant" or "Checkers"), the terms of which are set forth in the "Settlement Agreement and Release" ("Settlement Agreement" or "SA") attached hereto as **Exhibit 1**.[1]

## I.    INTRODUCTION

This Action[2] was initiated following Checkers' announcement that it was the subject of third-party cyberattacks involving malware variants which compromised its customers' personally identifiable information ("PII"). Plaintiffs allege, *inter alia*, that Checkers was negligent, breached its contracts with its customers, and violated state consumer protection laws when it failed to

---

[1] Unless otherwise defined herein, all capitalized terms have the same force, meaning, and effect as ascribed in the Definitions embodied in Article II of the Settlement Agreement (SA ¶¶ 2.01-2.35).

[2] Plaintiff Cotter filed the initial complaint in the above-captioned action on June 6, 2019. (Doc. 1). On July 2, 2019, Jack Dinh filed a complaint in the Central District California in an action styled *Jack Dinh v. Checkers Drive-In Restaurants, Inc.*, No. 8:19-cv-01310 (C.D. Cal.). For purposes of settlement, the Parties agreed to consolidate these matters into the present *Cotter* action. Throughout this Motion, Plaintiffs will be referred to in the plural in anticipation of the Court's approval of the Amended Complaint adding Mr. Dinh as a named plaintiff.

protect Plaintiffs' PII from being compromised in the Data Breach at issue. As a result of swift litigation, collaborative and targeted discovery, mediation, and post-mediation confirmatory discovery, the Parties reached a hard-fought and arms-length resolution to this Action.

The Settlement is fair, reasonable, and adequate, and is in the best interests of the nationwide Settlement Class Members ("Class Members"). The Settlement squarely addresses the issues raised in the Action and affords Class Members significant monetary and nonmonetary relief: tiered monetary relief to compensate Class Members for inconveniences and losses, and injunctive relief designed to better protect Defendant against similar data breaches that may again compromise consumers' PII. The Settlement compares favorably with settlements in similar litigation and was reached only after intensive, arms-length negotiations before a neutral and experienced mediator. If approved, the Settlement will resolve all claims arising out of the Data Breach and will provide Class Members with the precise relief this Action was filed to obtain. In light of the current pandemic that has upended the lives and finances of millions, immediate relief is now more valuable than ever.

Accordingly, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure and the Settlement Agreement, Plaintiffs respectfully request that the Court enter an order: (1) provisionally certifying the proposed Settlement Class; (2) preliminarily approving the Settlement; (3) approving the proposed Notice Program and the form and content of the Claim Form and Notices attached to the Settlement Agreement as Exhibits B, C, D and F;[3] (4) appointing Angeion Group, LLC to serve as Settlement Administrator; (5) approving the proposed opt-out and objection procedures; (6) appointing Plaintiffs Breandan Cotter and Jack Dinh as Representative Plaintiffs; (7) appointing Tina Wolfson and Bradley K. King of Ahdoot & Wolfson, PC, Jean

---

[3] Unless otherwise stated, the Exhibits are to the Settlement Agreement.

Sutton Martin of Morgan & Morgan Complex Litigation Group, and Abbas Kazerounian and Jason Ibey of Kazerouni Law Group, APC as Settlement Class Counsel; and (8) scheduling a Final Approval Hearing at a time and date convenient for the Court, and in conformity with the provisions of the Class Action Fairness Act of 2005, 28 U.S.C. § 1715 ("CAFA").[4]

## II.    SUMMARY OF THE LITIGATION

On May 29, 2019, Defendant[5] confirmed a massive breach involving certain Checkers and Rally's restaurants in which its customers' PII had been stolen via malicious software installed by unauthorized third parties on the point-of-sale ("POS") systems at those restaurants. Defendant stated that the malware was "designed to collect information stored on the magnetic stripe of payment cards, including cardholder name, payment card number, card verification code and expiration date."[6] Although dates vary by location, the malware at issue remained in the affected POS systems from December 2015 to October 2019, during which, the malware intermittently accessed and acquired cardholders' names, payment card numbers, card verification codes, and expiration dates ("Payment Card Data" or "PCD"). As result, up to 1,500,000 payment card transactions were captured by data thieves.

Plaintiffs allege that Defendant failed to ensure that access to the affected data systems was reasonably safeguarded, failed to acknowledge and act upon industry warnings, failed to use proper security systems and protocols to detect and deter the type of attack that occurred, and failed to provide timely and adequate notice to Plaintiffs and other Class Members that their PII had been

---

[4] A proposed Preliminary Approval Order entering the relief requested herein is attached to the Settlement Agreement as Exhibit A.

[5] Defendant is one of the largest chains of drive through quick service restaurants in the continental United States. Defendant franchises two chains of restaurants both selling hamburgers, hot dogs, and french fries. The "Checkers" restaurants are located in the Southwest and Northeast of the United States, and the "Rally's" restaurants are located in the Midwest and in California.

[6] https://www.checkers.com/security-issue/ (last visited April 30, 2020).

stolen, putting Plaintiffs and Class Members at a substantially increased risk of identity theft. Defendant has hotly disputed those allegations, claiming, among other things, that each of the affected restaurants was independently owned and operated by franchisees.[7]

The Parties proceeded to conduct discovery.[8] Throughout the discovery process, the Parties engaged in arm's-length discussions regarding a potential settlement. The Parties agreed to and did retain Steven R. Jaffe, *Esq*., a highly experienced mediator, to assist the Parties in settlement negotiations. (Declaration of Jean Sutton Martin, filed concurrently herewith ("Martin Decl.") ¶ 16, attached hereto as **Exhibit 2**). Prior to the mediation, the Parties briefed their respective positions on the facts, claims, defenses, and assessments of the risk of litigation. *Id*. ¶ 17. The Parties also submitted a draft settlement term sheet prepared by Plaintiffs, which was then used as the basis for negotiations. *Id*. Defendant also provided Plaintiffs with directed, informal discovery (660 pages) which included: (1) franchise agreements for several locations affected by the Data Breach, which are believed to be representative of the franchise agreements of the approximately 105 affected locations; (2) the number and identity of the affected restaurants; (3) information concerning what consumer contact information Checkers maintains; (4) preliminary information regarding the approximate number of payment card transactions during the Data Breach period; and (5) the Mandiant Report dated August 5, 2019 concerning the Data Breach. Checkers was also forthcoming about its current financial status and corporate affairs. *Id*.

---

[7] Similarly, Defendant claims that even if it could be held liable for the independent acts of of the franchisees, those franchisees utilized sufficient measures to protect the compromised data, notwithstanding the Data Breach. Likewise, Defendant disputes the existence and measure of damages allegedly incurred as a result of the Data Breach. And finally, Defendant has disputed these claims are appropriate for class treatment, particularly given the multitude of varying laws potentially in play by virtue of a putative nationwide class, and the difficulty of proving classwide damages through a common body of evidence and a common methodology.

[8] Given the near identity of the *Cotter* and *Dinh* actions—including the underlying cyberattack, the claims asserted, the putative class definitions, and the legal teams—the Parties in both actions, during early Rule 26(f) conferences and other discussions, agreed to jointly conduct pre-mediation discovery and to jointly mediate the actions. (Docs. 10, 14, 18, 20, 22, and 23).

On November 21, 2019, the Parties, through their respective counsel, engaged in a full-day mediation session before Mr. Jaffe. The negotiations were hard-fought throughout and the settlement process was conducted at arm's length. *Id.* ¶ 20. With the assistance of Mr. Jaffe, the Parties were able to reach a negotiated resolution to the Action on a class-wide basis that provides both injunctive and monetary relief to Class Members. (Doc. 24). Martin Decl. ¶ 20. On November 22, 2019, the Court was advised that the Parties had reached a final, comprehensive settlement (Doc. 24).[9] During the ensuing months, the Parties continued the exchange of information and negotiations as to the final details of the Settlement Agreement. Defendant provided confirming documentation from payment card processors regarding the number of payment card transactions during the relevant windows of exposure at each of the restaurant locations affected by the Data Breach as well as additional detail on the customer contact information it maintains from its customer loyalty program. Martin Decl. ¶¶ 17-18. Based on Plaintiffs' counsel's independent investigation of the relevant facts and applicable law, experience with other data breach cases, the information provided by Defendant, and the strengths and weaknesses of the parties' respective positions (including the defenses summarized above, *see supra* note 7), Plaintiffs' counsel determined that the Settlement is fair, reasonable, adequate, and in the best interest of the Settlement Class. *Id.* ¶ 39.

The Parties jointly selected Angeion Group, LLC to serve as the Settlement Administrator. *Id.* ¶ 26; SA ¶ 2.31. The Parties worked together to refine the details of the proposed Notice Program and each document comprising the Class Notice, which are embodied in the Settlement Agreement and the Exhibits attached thereto. Martin Decl. ¶ 23.

---

[9] Following the successful mediation, the *Dinh* action was voluntarily dismissed without prejudice, and Mr. Dinh's counsel (Messrs. Abbas Kazerounian and Jason A. Ibey) entered appearances and were admitted *pro hac vice* on behalf of Plaintiff Cotter. (Docs. 29-33). On April 28, 2020, Plaintiff Cotter filed an amended class action complaint, which is currently pending before this Court, adding Mr. Dinh as a named plaintiff in this action. (Docs. 40-41).

### III.    THE PROPOSED SETTLEMENT TERMS

The material terms of the proposed Settlement are summarized as follows:

### A.    The Settlement Class

Pursuant to the Settlement Agreement, Plaintiffs request that the Court provisionally certify the following Settlement Class:

> All residents of the United States who made a credit or debit card purchase at any Affected Restaurant during the period of the Data Breach Incident.

SA ¶ 2.32.[10]

### B.    Compensation to Settlement Class Members

#### 1.    Cash Payment for Reimbursement of Out-of-Pocket Expenses

All Class Members who submit a valid and timely Claim Form and supporting documentation are eligible to receive up to $5,000 per Class Member for reimbursement for documented out-of-pocket expenses incurred as a result of the Data Breach.[11] To receive payment for out-of-pocket expenses, the Class Member must complete the appropriate section of the Claim Form and provide documentation supporting a claim for out-of-pocket expenses, which could include but is not limited to, a receipt from an Affected Restaurant reflecting payment by a payment card during the Data Breach; a payment card statement reflecting a charge at an Affected

---

[10]  Excluded from the Settlement Class are Defendant and any of its affiliates, parents or subsidiaries; all employees of Defendant; all persons who timely elect to be excluded from the Class; government entities; and the judges assigned to this action and the related *Dinh* action, including the judges' immediate families and court staff.

[11]  Class Members may claim reimbursement for one or more of the following: (i) costs and expenses spent addressing identity theft or fraud; (ii) losses caused by restricted access to funds (*e.g.*, costs of taking out a loan, ATM withdrawal fees); (iii) preventative costs including purchasing credit monitoring, placing security freezes on credit reports, or requesting copies of credit reports for review; (iv) late fees, declined payment fees, overdraft fees, returned check fees, customer service fees, and/or card cancellation or replacement fees; (v) unauthorized charges on credit or debit card that were not reimbursed; (vi) other documented losses that were not reimbursed; and (vii) up to four hours of documented time spent for personal investigation and remediation relating to the Data Breach (calculated at the rate of $20.00 per hour).  SA ¶ 3.02.

Restaurant during the Data Breach; or, notification from a bank or financial institution that a payment card was compromised as a result of the Data Breach. SA ¶ 3.02(b).

2.    To be considered valid, all Claim Forms and related documentation must be postmarked (or submitted electronically in accordance with the requirements for electronic submission of a Claim Form) on or before the Claims Deadline, which the Parties propose shall be the 120th day after the Preliminary Approval Date. SA ¶¶ 2.08, 3.02(a).  **Checkers and Rally's Restaurant Vouchers**

In addition to payment for Out-of-Pocket Expenses, all Class Members who submit a valid and timely Claim Form and attest that they used a payment card at an affected Checkers location during the Data Breach are eligible to receive four (4) Checkers vouchers of $5.00 each, which are valid for one (1) year at any Checkers and Rally's restaurant, and which are freely and fully transferrable. SA ¶ 3.01.

**C.    Remedial Measures Attributable to the Settlement**

An additional benefit of the Settlement is the remedial measures that Checkers (and Affected Franchisees) agreed to adopt, continue, or maintain as a result of this Litigation (SA ¶¶ 4.01-02), which will benefit all Class Members regardless of whether or not they submit a Claim. These remedial measures include, but are not limited to, implementation of mandatory cybersecurity and data privacy training for all managers within its organization over the next two (2) years; and implementation of a solution that encrypts payment card data when it is read by the card acceptance device/point of sale system and routes the authorization message out to the payment card networks without the authorization message data being unencrypted on devices owned and managed by Checkers and/or Affected Franchisees. SA ¶ 4.01.

### D.    Notice Program and Settlement Administration

The Settlement requires that Checkers pay all of the notice and administrative costs associated with implementing the Settlement. SA ¶ 3.04. Plaintiffs' counsel will work with Checkers in good faith to minimize these costs consistent with the requirements of Due Process.

As set forth in greater detail in the Settlement Agreement, notice to the Settlement Class will be provided *via* the following methods: (i) a national print publication; (ii) an internet banner ad campaign on various social media and news media platforms; (iii) a dedicated Settlement Website established and maintained by the Settlement Administrator which amongst other details will provide relevant dates and deadlines pertaining to the Settlement, specify the Affected Restaurant locations, and make important case documents available for review and download; and (iv) an e-mail to Class Members registered with Defendant's Flav-R-Hood loyalty program. SA ¶ 7.02. The Settlement Website will also provide Class Members with the ability to submit an online request to opt out of the Settlement. *Id.* ¶ 8.01. Finally, the Settlement Administrator will establish a toll-free help line to address Class Members' inquiries. *Id.* ¶ 7.02.

### E.    Attorneys' Fees and Expenses and Service Awards

Plaintiffs will request a total for both attorneys' fees and expenses of $575,000. Checkers agrees to pay the fees and expenses of legal counsel for Plaintiffs in an aggregate amount not to exceed $575,000, subject to Court approval. SA ¶ 11.03. Plaintiffs will also request a service award for each of the two named Plaintiffs. Checkers agrees to pay a service award not to exceed $2,500 for each of the two named Plaintiffs, subject to approval by the Court. SA ¶ 11.02. Attorneys' fees, costs, expenses, and the service awards were negotiated only after all substantive terms of the Settlement were agreed upon by the Parties. *Id.*; Martin Decl. ¶ 21.

## IV.    ARGUMENT

### A.    Certification of the Settlement Class is Appropriate

Prior to preliminarily approving a proposed settlement, the Court must first determine whether the proposed Settlement Class is appropriate for certification. *See* Manual for Complex Litig., § 21.632 (4th ed. 2004); *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 620 (1997). Class certification is proper if the proposed settlement satisfies Rule 23(a)'s numerosity, commonality, typicality, and adequacy of representation requirements. Rule 23(a)(1-4); *Fabricant v. Sears Roebuck*, 202 F.R.D. 310, 313 (S.D. Fla. 2001). Additionally, where, as here, certification is sought under Rule 23(b)(3), the plaintiff must demonstrate that common questions of law or fact predominate over individual issues and that a class action is superior to other methods of adjudicating the claims. *Amchem*, 521 U.S. at 615–16. In the context of settlement, district courts are vested with broad discretion in determining whether certification of a class action is appropriate. *Walco Investments, Inc. v. Thenen*, 168 F.R.D. 315, 323 (S.D. Fla. 1996); *Burrows v. Purchasing Power, LLC*, No. 1:12-CV-22800, 2013 WL 10167232, at *1 (S.D. Fla. Oct. 7, 2013) ("A class may be certified 'solely for purposes of settlement where a settlement is reached before a litigated determination of the class certification issue.'") (quoting *Lipuma v. American Express Co.*, 406 F. Supp. 2d 1298, 1314 (S.D. Fla. 2005)); *see also, Amchem*, 521 U.S. at 620 ("[F]or settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial.")

This case meets all of the requirements of Rule 23(a) and (b)(3).

### 1.    The Proposed Settlement Class Meets the Requirements of Rule 23(a)

#### a.    Numerosity

Numerosity requires that a "class [be] so numerous that joinder of all members is impractical." Fed. R. Civ. P. 23(a)(1). "While 'mere allegations of numerosity are insufficient,'

Fed. R. Civ. P. 23(a)(1) imposes a 'generally low hurdle,' and 'a plaintiff need not show the precise number of members in the class.'" *Manno v. Healthcare Revenue Recovery Grp., LLC*, 289 F.R.D. 674, 684 (S.D. Fla. 2013) (citation omitted). Courts require only that the plaintiff provide "some evidence of the number of members in the purported class, or at least a reasonable estimate of that number." *Leszczynski v. Allianz Ins.*, 176 F.R.D. 659, 669 (S.D. Fla. 1997).

Here, Defendant identified in discovery approximately 1,500,000 payment cards affected by the Data Breach and likely as many people in the putative class. Thus, the numerosity requirement is easily satisfied.

### b.    Commonality

Commonality "requires the plaintiff to demonstrate that the class members 'have suffered the same injury,'" and that at least one common contention is "of such a nature that it is capable of classwide resolution." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2545 (2011) (citation omitted). The commonality requirement presents a low hurdle, as commonality does not require that all questions of law and fact raised be common. *Muzuco v. Re$ubmitIt, LLC*, 297 F.R.D. 504, 514 (S.D. Fla. 2013); *Dukes*, 131 S. Ct. at 2556 ("[F]or purposes of Rule 23(a)(2) '[e]ven a single [common] question' will do."). Rule 23(a)(2) requires "only that there be at least one issue whose resolution will affect all or a significant number of the putative class members." *Sharf v. Fin. Asset Resolution, LLC*, 295 F.R.D. 664, 669 (S.D. Fla. 2014) (internal citations omitted).

Here, the commonality requirement of Rule 23(a)(2) is readily satisfied. Class Members are joined by common questions of law and fact that arise from the same event—the Data Breach. The critical issues posed by this litigation are: (1) whether the PII of Class Members was obtained by a third party without authorization due to compromised POS systems at Checkers restaurant locations; (2) whether Defendant had a duty to protect the PII of Class Members from disclosure; and (3) whether Class Members were injured by Defendant's failure to protect their PII. The central

question behind every claim in this Action is whether Defendant adequately secured its consumers'
PII. The answer to that question depends on common evidence that does not vary from class
member to class member, and can be fairly resolved on a class-wide basis—whether through
litigation or settlement—for all class members at once. These common issues converge at the
center of Defendant's conduct in this Action, satisfying the commonality requirement. *See, e.g.*,
*In re Countrywide Fin. Corp. Cust. Data Sec. Breach Litig.*, No. 3:08-MD-01998, 2009 WL
5184352, at *3 (W.D. Ky. Dec. 22, 2009) (commonality satisfied where all "class members had
their private information stored in Countrywide's databases at the time of the data breach."); *In re
Heartland Payment Sys., Inc. Cust. Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1059 (S.D.
Tex. 2012) (commonality satisfied where answering "the factual and legal questions about
Heartland's conduct will assist in reaching classwide resolution.").

### c.   Typicality

Typicality, "measures whether a significant nexus exists between the claims of the named
representative and those of the class at large." *Hines v. Widnall*, 334 F.3d 1253, 1256 (11th Cir.
2003); Fed. R. Civ. P. 23(a)(3). A class representative's claims are typical of the claims of the
class if they "arise from the same event or pattern or practice and are based on the same legal
theory." *Kornberg v. Carnival Cruise Lines, Inc*., 741 F.2d 1332, 1337 (11th Cir. 1984); *see also
Cooper v. S. Co*., 390 F.3d 695, 714 (11th Cir. 2004) ("Neither the typicality nor the commonality
requirement mandates that all putative class members share identical claims, and . . . factual
differences among the claims of the putative members do not defeat certification."). When the
same course of conduct is directed at both the named plaintiff and the members of the proposed
class, the typicality requirement is met. *Kennedy v. Tallant*, 710 F.2d 711, 717 (11th Cir. 1983).

Here, Plaintiffs' claims arise from the same event (the Data Breach), that gives rise to the
claims of the other Class Members and are based on the same legal theory, *i.e*., that Defendant had

a legal duty to protect Plaintiffs' and Class Members' PII. Because there is a "sufficient nexus" between the Plaintiffs' claims and the claims of Class Members, typicality is satisfied. *Hines*, 334 F.3d at 1256.

### d.    Adequacy

Rule 23(a)(4) is two-fold. It requires that: (1) the class representative "not possess interests which are antagonistic to the interests of the class," and (2) "the representative's counsel must be qualified, experienced, and generally able to conduct the proposed litigation." *CV Reit, Inc. v. Levy*, 144 F.R.D. 690, 698 (S.D. Fla. 1992) (citation omitted).

Both components are satisfied because Plaintiffs' interests in this litigation are aligned with, and not antagonistic to, those of the Settlement Class, and because Plaintiff are represented by qualified and competent counsel. Plaintiffs provided their PII to Defendant and allege that their PII was compromised as a result of the Data Breach, just as the PII of the Settlement Class was also allegedly compromised. Indeed, Plaintiffs' claims are identical to the claims of the Settlement Class, and Plaintiffs and the Settlement Class desire the same outcome in this Action. Plaintiffs have vigorously prosecuted this case thus far for the benefit of all Class Members. Martin Decl. ¶ 37. Plaintiffs have participated in the Action, reviewed pleadings, served discovery, and provided input in crafting and approving the Settlement. *Id.*

In addition, proposed Settlement Class Counsel are experienced in nationwide class action litigation; with respect to data breach class actions, the undersigned are well recognized practice leaders. *Id.* ¶¶ 35- 36. Moreover, because Plaintiffs and their counsel have devoted considerable time and resources to this litigation and have shown a deft understanding of the issues in this Action, the adequacy requirement is satisfied. *Id.* ¶ 37.

### 2.    The Predominance and Superiority Requirements of Rule 23(b)(3) Are Met

In addition to meeting the prerequisites of Rule 23(a), the proposed Settlement Class must

also meet one of the three requirements of Rule 23(b). *In re Checking Account Overdraft Litig.*, 275 F.R.D. 654, 660 (S.D. Fla. 2011). Here, Plaintiffs seek certification under Rule 23(b)(3), which requires that: (1) questions of law and fact common to members of the class predominate over any questions affecting only individuals; and (2) the class action mechanism is superior to other available methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3). The Settlement Class readily meets these Rule 23(b)(3) requirements.

### a.    Predominance

Rule 23(b)(3)'s predominance requirement focuses primarily on whether a defendant's liability is common enough to be resolved on a class basis, *see Dukes*, 131 S. Ct. at 2551–57, and whether the proposed class is "sufficiently cohesive to warrant adjudication by representation," *see Amchem*, 521 U.S. at 623. Common issues of fact and law predominate in a case "if they have a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief." *BellSouth Telecomms., Inc.*, 275 F.R.D. at 644 (citing *Klay v. Humana, Inc.*, 382 F.3d 1241, 1255 (11th Cir. 2004)); *see also Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1179 (11th Cir. 2010) (noting that "[t]he relevant inquiry [is] whether questions of liability to the class . . . predominate over . . . individual issues relating to damages. . . ."). Predominance does not require that all questions of law or fact be common, but rather, that a significant aspect of the case "can be resolved for all Settlement Class Members of the class in a single adjudication." *In re Checking*, 275 F.R.D. at 660. "When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (quoting 7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure

§1778, 123–124 (3d ed. 2005)).

Common issues predominate here because the central liability question in this case—whether Defendant failed to safeguard Plaintiffs' PII, like that of every other Class Member—can be established through generalized evidence. *See Klay*, 382 F.3d at 1264 ("When there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class member's individual position, the predominance test will be met."). Several case-dispositive questions can be resolved identically for all members of the Settlement Class, such as whether Defendant had a duty to exercise reasonable care in safeguarding, securing, and protecting the PII of Plaintiffs and Class Members and whether Defendant breached that duty.

Numerous courts have recognized that these types of common issues arising from a data breach predominate over individualized issues. *See, e.g., In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*, No. 3:08-md-1998, 2009 WL 5184352, at *6-7 (W.D. Ky. Dec. 22, 2009) (finding predominance where proof would focus on data breach defendant's conduct both before and during the theft of class members' personal information); *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1059 (S.D. Tex. 2012) (finding predominance where "several common questions of law and fact ar[ose] from a central issue: Heartland's conduct before, during, and following the data breach, and the resulting injury to each class member from that conduct"). Accordingly, the common questions of fact and law that arise from Defendant's conduct predominate over any individualized issues.

### b.  Superiority

Finally, a class action is superior to other methods available to fairly, adequately, and efficiently resolve the claims of the proposed Settlement Class. As courts have historically noted, "[t]he class action fills an essential role when the plaintiffs would not have the incentive or

resources to prosecute relatively small claims in individual suits, leaving the defendant free from legal accountability." *In re Checking*, 286 F.R.D. at 659. "The inquiry into whether the class action is the superior method for a particular case focuses on 'increased efficiency.'" *Agan v. Katzman & Korr, P.A.*, 222 F.R.D. 692, 700 (S.D. Fla. 2004) (quoting *Sikes v. Teleline, Inc*., 281 F.3d 1350, 1359 (11th Cir. 2002)). Factors the Court may consider are: (1) the interests of members of the class in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class.

Here, resolution of numerous claims in one action is far superior to individual lawsuits, because it promotes the adjudication of claims in a manner that is consistent, efficient, fair, and in conformity with Due Process. *See* Fed. R. Civ. P. 23(b)(3). Absent class treatment in the instant case, each Class Member will be required to present the same or substantially similar legal and factual arguments, in separate, duplicative proceedings, the result of which would be a multiplicity of trials conducted at enormous expense to both the judiciary and the litigants. There is also the possibility that individual claims would lead to inconsistent results.

Moreover, there is no indication that Class Members have an interest in individual litigation or an incentive to pursue their claims individually, given the amount of damages likely to be recovered relative to the high costs of prosecuting each individual action to final judgment. *See In re Terazosin Hydrochloride Antitrust Litig*., 220 F.R.D. 672, 700 (S.D. Fla. 2004) (class actions are "particularly appropriate where . . . it is necessary to permit the plaintiffs to pool claims which would be uneconomical to litigate individually").

Accordingly, the requirements for certification under Rule 23(a) and (b) are satisfied.

B.    **The Proposed Settlement is Fair, Reasonable, and Adequate and Should Be Preliminarily Approved**

Rule 23(e) provides that a court may approve a proposed class settlement "on a finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). The procedure for review of a proposed class action settlement is a well-established two-step process. Alba & Conte, 4 Newberg on Class Actions, §11.25, at 38–39 (4th ed. 2002) (hereinafter "Newberg on Class Actions"). In the first step, the Court determines whether the proposed settlement should be preliminarily approved. *See* David F. Herr, *Annotated Manual for Complex Litigation* § 21.632 (4th ed. 2004). In the second step, after hearing from any objectors and being presented with declarations and materials to support the fairness of the settlement, the Court makes a final decision whether the settlement should be finally approved. *See id.* §§ 21.633-35. "Preliminary approval is appropriate where the proposed settlement is the result of the parties' good faith negotiations, there are no obvious deficiencies and the settlement falls within the range of reason." *Smith v. Wm. Wrigley Jr. Co.*, No. 09-cv-60646, 2010 WL 2401149, at *2 (S.D. Fla. Jun. 15, 2010).

1.    **Legal Standard for Approval of a Settlement**

Recent revisions to Rule 23(e)[12]—effective on December 1, 2018—standardized the analysis needed at the preliminary approval stage.[13] The Advisory Committee noted, however, that

---

[12]  Amended Rule 23(e)(1) provides that notice should be given to the class, and hence, preliminary approval should be granted, where the Court "will likely be able to" (i) finally approve the settlement under Amended Rule 23(e)(2), and (ii) certify the class for settlement purposes. Fed. R. Civ. P. 23(e)(1)(B)(i)–(ii). As explained above, the proposed Settlement Class here meets the criteria for certification of Rule 23(a), including all aspects of numerosity, commonality, typicality, adequacy, and predominance.  *Supra* § IV.A.  Rule 23(e)(1)(B)(ii) is therefore met.

[13]  Historically, to grant preliminary approval, a court needed to find only that: (1) the parties' negotiations occurred at arm's length between attorneys experienced in similar litigation; (2) there was sufficient discovery; and (3) the settlement falls within the range of reason. *See In re Checking Account Overdraft Litig.*, 275 F.R.D. 654, 662-3 (S.D. Fla. 2011). Upon such findings, a settlement agreement was entitled to a presumption of fairness and would be granted preliminary approval.  *Id.* A fourth factor, the number of objections to the settlement, is not properly evaluated until the final approval stage. *Smith*, 2007 WL 4191749, at *1, n.3.

"[t]he goal of this amendment is not to displace any factor" previously considered in any given Circuit. *See also*, 4 Newberg on Class Actions § 13:58 (5th ed.) ("[V]arious pre-existing legal factors not captured by amended Rule 23(e)(2)'s list of factors may prove relevant in particular cases.").

Approval is proper under the amended Rule 23(e)(1)(B)(i) upon a finding that the settlement is "fair, reasonable, and adequate" after considering whether:

> (A) the class representatives and class counsel have adequately represented the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account:
> > (i) the costs, risks, and delay of trial and appeal;
> > (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
> > (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
> > (iv) any agreement required to be identified under Rule 23(e)(3); and
> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e).

### 2. The Proposed Settlement Satisfies the Standard for Preliminary Approval

#### a. Adequacy of Representation

As explained above, Plaintiffs have retained attorneys with extensive experience prosecuting class actions, particularly data breach and data disclosure cases, throughout the nation and who have zealously represented the Class at all time. *Supra* § IV.4.A.1.d. In addition, there is no conflict or any antagonism between Plaintiffs and the Settlement Class; to the contrary, Plaintiffs have vigorously prosecuted this case for the benefit of all members of the Settlement Class. *Supra* § IV.A.1.d.

#### b. Arm's-Length Negotiations

The Settlement resulted from arm's-length negotiations between experienced counsel with an understanding of the strengths and weaknesses of their respective positions in this Action, under

the supervision of a neutral and experienced mediator. Martin Decl. ¶¶ 16, 20-21, 38, 40. These circumstances weigh in favor of approval. *See Perez v. Asurion Corp*., 501 F. Supp. 2d 1360, 1384 (S.D. Fla. 2007) (concluding that class settlement was not collusive in part because it was overseen by "an experienced and well-respected mediator"); *Lipuma*, 406 F. Supp. 2d at 318–19; Manual for Complex Litig. at §30.42 ("A presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery.") (internal quotation marks omitted).

Additionally, the Parties spent significant time negotiating the terms of the final written Settlement Agreement which is now presented to the Court for approval. Martin Decl. ¶¶ 23, 40. At all times, these negotiations were at arm's length and, while courteous and professional, the negotiations were intense and hard-fought on all sides. *Id.* ¶¶ 21, 40.

### c.    The Relief Provided for The Class Is Adequate

The relief offered by the Settlement (both monetary and injunctive) is adequate considering the risks of continued litigation. Although Plaintiffs are confident in the merits of their claims, the risks involved in prosecuting a class action through trial cannot be disregarded. *Id.* ¶¶ 29-31. Plaintiffs' claims would still need to survive likely motions practice (*e.g.*, a motion to dismiss and motion for summary judgment) and succeed at class certification).

Almost all class actions involve a high level of risk, expense, and complexity, which is one reason that judicial policy so strongly favors resolving class actions through settlement, "[T]here is an overriding public interest in settling class action litigation, and it should therefore be encouraged." *In re Warfarin*, 391 F.3d at 535; *see also In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992) ("Public policy strongly favors the pretrial settlement of class action lawsuits"); *Warren v. City of Tampa*, 693 F. Supp. 1051, 154 (M.D. Fla. 1998). This is not only a complex case, but it is in an especially risky field of litigation: data breach. *See, e.g., In re*

*Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*, 2010 WL 3341200, at *6 (W.D. Ky. Aug. 23, 2010) (approving data breach settlement, in part, because "proceeding through the litigation process in this case is unlikely to produce the plaintiffs' desired results").

Data breach cases, such as this one, are especially risky, expensive, and complex. *See In re Sonic Corp. Customer Data Sec. Breach Litig.*, No. 1:17-md-2807, 2019 WL 3773737, at *7 (N.D. Ohio Aug. 12, 2019) ("Data breach litigation is complex and risky. This unsettled area of law often presents novel questions for courts. And of course, juries are always unpredictable."). Although data breach law is continuously developing, data breach cases are still relatively new, and courts around the country are still grappling with what legal principles apply to the claims. *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 315 (N.D. Cal. 2018) (noting that "many of the legal issues presented in [] data-breach case[s] are novel"). Because the "legal issues involved in [in data breach litigation] are cutting-edge and unsettled … many resources would necessarily be spent litigating substantive law as well as other issues." *In re Target Corp. Customer Data Security Breach Litig.*, No. 14-2522 (PAM/JJK), 2015 WL 7253765, at *2 (D. Minn. Nov. 17, 2015). And this case presents an additional layer of complication:  Defendant claims all affected restaurants were operated by franchisees. Through the Settlement, Plaintiffs and Class Members gain significant benefits without having to face further risk.

While Plaintiffs believe that they would prevail on their claims, there is little directly analogous precedent to rely upon. Martin Decl. ¶ 30. Beyond the merits, class certification is challenging in any case. Class certification has been denied in other consumer data breach cases and to date only one (b)(3) class has been certified in a consumer data breach case. *See Smith v. Triad of Alabama, LLC*, No. 1:14-cv-324-WKW, 2017 WL 1044692, at *6 (M.D. Ala. Mar. 17, 2017). Further, while Plaintiffs feel that they would be able to obtain certification outside of a settlement context and maintain certification through trial, this is not certain. *Id*. Any potential

certification would also be subject to later appeal and potential reversal. The cost of trial and any appeals would be significant and would delay the resolution of this litigation without the guarantee of any relief. *Id.*

Furthermore, the outcome of this Settlement should be considered not only as favorable as other payment card data breach class action settlements, but as more favorable given that multiple other payment card data breach cases have resulted in no recovery for the plaintiff or class members. *See, e.g., Dugas v. Starwood Hotels & Resorts Worldwide, Inc.*, 3:16-cv-00014-GPC-BLM (S.D. Cal.), Doc. 56 (order dismissing payment card data breach case) (July 11, 2017); *Whalen v. Michaels Stores, Inc.*, 689 F. App'x 89 (2d Cir. 2017) (order affirming dismissal of payment card data breach case).[14]

The Settlement is a claims-made settlement that will provide Class Members with significant and timely benefits which compare favorably to what Class Members could recover were they to secure a favorable judgment at trial. In the experience of proposed Class Counsel, the monetary relief provided by this Settlement is an outstanding result, and is fair and reasonable in light of reported average out-of-pocket expenses due to a data breach, including a class action settlement reached and approved in this District that similarly involved a payment card data breach at franchised restaurants..[15] *See Jackson et al. v. Wendy's International, LLC*, No. 6:16-cv-21-PGB-DCI (M.D. Fla.) (Doc. 157) (approving settlement that provides class members reimbursement of documented losses of up to $5,000); *see also Hapka v. CareCentrix, Inc.*, No.

---

[14]  The same is true for data breach cases involving solely PII, and no PCD. *See, e.g., Storm v. Paytime, Inc.*, 90 F. Supp. 3d 359, 368 (M.D. Pa. 2015) (dismissed for lack of standing as plaintiffs failed to demonstrate that they had suffered actual harm, such as, identity theft); *Longenecker-Wells v. Benecard Servs. Inc*, 658 F. App'x 659, 663 (3d Cir. 2016) (negligence claim barred by economic loss doctrine and breach of implied contract dismissed for failure to plead sufficient allegations).

[15]  For individuals who experienced actual identity theft, a 2014 Congressional Report stated that these victims incurred an average of $365.00 in expenses in dealing with the fraud. *See* Kristin Finklea, Congressional Research Service, *Identity Theft: Trends and Issues* (January 16, 2014), p. 2, available at https://fas.org/sgp/crs/misc/R40599.pdf (last visited March 11, 2020).

2:16-CV-02372-KGG, 2018 WL 1879845, at *3 (D. Kan. Feb. 15, 2018) ("The Settlement addresses past harms through reimbursement of Out-of-Pocket Losses or the alternative minimum $200 payment for tax fraud and also helps Settlement Class Members protect against future harm through the Credit Monitoring Services."). And unlike many claims-made settlements, the Settlement does not cap the total potential recovery available to Settlement Class Members. *Compare Wendy's*, *supra*.

In addition, the monetary benefits provided by the Settlement are in line with, or superior to, those of other settlements in data breach class actions that have been approved by other courts. *See*, *e.g., Bray, et. al. v. GameStop Corp*., No. 1:17-cv-01365 (D. Del. Dec. 19, 2018) (approving claims made settlement that would reimburse up to $235/claim including, *inter alia*, expenses for lost time, payment for each card on which fraudulent charges incurred, costs of obtaining credit report, costs of credit monitoring and identity theft protection, as well as up to $10,000/claim for extraordinary expenses); *T.A.N. v. PNI Digital Media, Inc*., No. 2:16-cv 00132, Doc. 46 (S.D. Ga. Oct. 20, 2017) (approving settlement for reimbursement up to $250/claim for out-of-pocket expenses plus up to $10,000/claim for reimbursement of extraordinary expenses).[16]

Here, the $20.00 in Vouchers (4 Vouchers x. $5.00) with simply an attestation of use of a payment card at an Affected Restaurant during the Data Breach is a novel benefit not found in many, if any, data breach settlements. SA ¶ 3.01. Additionally, the reimbursement for documented

---

[16] *See also, e.g., In re the Home Depot, Inc., Customer Data Sec. Breach Litig*., No. 1:14-MD-02583 TWT, 2016 WL 6902351, at *6 (N.D. Ga. Aug. 23, 2016) (approving $13 million fund, maximum of $10,000 in expense reimbursement, documented time of 5 hours at $15/hour and up to 2 hours of self-certified time only if had also documented losses with class size of 40 million consumers); *Target*, 2015 WL 7253765, at *1 (approving settlement that provided $10 million to pay for losses and time spent as a result of Target data breach, and injunctive relief with class size of 100 million consumers); *In re Heartland Payment Sys., Inc. Customer Data Security Breach Litig*., 851 F. Supp. 2d 1040, 1048 1069 (S.D. Tex. 2012) (approving settlement that provided up to $2.4 million to pay for out-of-pocket losses); *In re Countrywide Financial Corp. Customer Data Security Breach Litig*., No. 3:08-MD-01998, 2009 WL 5184352, at *1-4 (W.D. Ky. Dec. 22, 2009). (approving settlement that provided up to $1.5 million to pay out-of-pocket costs, up to $5 million to pay identity theft losses, and 2 years of free credit monitoring services).

out-of-pocket losses due to fraud of up to $5,000 with compensation for time spent investigating and remediating fraud of up to $80.00 ($20.00/hour) compares favorably to past data breach settlements. *Id*. ¶ 3.02. Once the separately funded costs of notice and administration, and attorneys' fees, costs, and expenses and service awards are factored in, that comparison only heightens. *Id*. ¶¶ 3.04, 11.02-11.03.

Furthermore, the injunctive relief provided for in this Settlement is significant and ensures the rights of the class because it swiftly commits Defendant, and its Franchisee restaurants, to certain security measures and protection of personal information. These remedial measures are attributable to the Settlement and are squarely consistent with the claims on which Plaintiffs have focused in the litigation. *Id*. ¶ 4.01. These commitments will ensure the adequacy of Defendant's data security practices, and will provide ongoing protection for any Class Members' information, as well as providing protection for consumers in the future. Without this Settlement, there is little Class Members could do individually to achieve similar promises from Checkers regarding data security going forward. The Settlement is calculated to ensure that Checkers not only employs the necessary, immediate resources to address existing data security vulnerabilities, but also employs the consistent best practices and accountabilities needed for long-term, proactive data security.

The Settlement benefits present a substantial recovery, especially considering the litigation risks described above.

### d. The Settlement Treats Class Members Equitably Relative to Each Other

Finally, Amended Rule 23(e) requires that the Settlement "treat[] class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). Here, the Settlement treats all Class Members equitably relative to one another because all who have been damaged are eligible to receive reimbursement based on expenses incurred, not on any unequitable basis. SA ¶ 3.02.

### C.    The Proposed Class Notice Satisfies Rule 23

"Rule 23(e)(1)(B) requires the court to direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise regardless of whether the class was certified under Rule 23(b)(1), (b)(2), or (b)(3)." Manual for Compl. Litig. § 21.312 (internal quotation marks omitted). The best practicable notice is that which is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co*., 339 U.S. 306, 314 (1950). To satisfy this standard, "[n]ot only must the substantive claims be adequately described but the notice must also contain information reasonably necessary to make a decision to remain a class member and be bound by the final judgment or opt out of the action." *Twigg v. Sears, Roebuck & Co*., 153 F.3d 1222, 1227 (11th Cir. 1998) (internal quotation marks omitted).

The proposed Notice Program here satisfies all of these criteria and is designed to provide "direct notice in a reasonable manner to all class members who would be bound by the proposal…." Fed. R. Civ. P. 23(e)(1)(B). The Notice Program is reasonably calculated under the circumstances to apprise the Settlement Class of the pendency of the case, the proposed Settlement and its terms, any request for attorneys' fees and expenses and Service Awards, and the Class Members' rights to opt-out of or object to the Settlement, as well as the other information required by Fed. R. Civ. P. 23(c)(2)(B). *See* Declaration of Steven Weisbrot, attached hereto as **Exhibit 3**.

Notice will be provided to Class Members through: (i) one national print publication; (ii) an internet banner ad campaign; (iii) a dedicated Settlement Website which amongst other details will specify the Affected Restaurant locations and provide Class Members with important information about the Settlement; and (iv) direct, individual notice via e-mail to Class Members registered with Defendant's Flav-R-Hood loyalty program. *See* SA, Exs. B, C and E. Finally, in

accord with CAFA, Defendant will provide timely notice of the Settlement to the Attorneys General of each state in which Settlement Class Members reside, the Attorney General of the United States, and any other required government officials. SA ¶ 14.12.

Therefore, the Notice Program (including the proposed Notice forms) comply with all applicable law, including, Rule 23 and Due Process.[17] Accordingly, Plaintiffs respectfully request that the Court approve the Notice Program and direct Notice to the Settlement Class.

### D.    Plaintiffs' Counsel Should Be Appointed as Settlement Class Counsel

Under Rule 23, "a court that certifies a class must appoint class counsel . . . [who] must fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B). In making this determination, the court must consider the proposed class counsel's: (1) work in identifying or investigating potential claims; (2) experience in handling class actions or other complex litigation and the types of claims asserted in the case; (3) knowledge of the applicable law; and (4) resources committed to representing the class. Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv).

As discussed above, and as fully explained in Jean Sutton Martin's Declaration, proposed Settlement Class Counsel have extensive experience prosecuting similar class actions and other complex litigation. Martin Decl. ¶ 36. The proposed Settlement Class Counsel have diligently investigated and efficiently prosecuted the claims in this matter, dedicated substantial resources toward the endeavor, and have successfully and fairly negotiated the Settlement of this matter to the benefit of Plaintiffs and the Settlement Class. *Id.* ¶ 37.. Accordingly, Plaintiffs request that the Court appoint Tina Wolfson, Bradley K. King, Jean Sutton Martin, Abbas Kazerounian, and Jason A. Ibey as Settlement Class Counsel.

---

[17]  The form of the Preliminarily Approval Order (Exhibit A), which was drafted and approved by Plaintiffs' counsel and Defendant's counsel, and the proposed Claim Form (Exhibit D), likewise satisfy all of the criteria of Rule 23.

### E.    The Court Should Schedule a Final Approval Hearing and Pertinent Deadlines

In connection with the preliminary approval of the Settlement, Plaintiffs request that the Court to set (1) a date for the Final Approval Hearing no earlier than 90 days from the Preliminary Approval Order, (2) dates for filing papers relating to final approval and attorneys' fees, (3) dates for sending notice to the Settlement Class, and (4) deadlines for any requests for exclusion or objections. Plaintiffs propose the following schedule:

| Event | Time for Compliance |
|---|---|
| Creation of Settlement Website | 30 days after entry of the Preliminary Approval Order |
| Notice Date | 30 days after entry of the Preliminary Approval Order |
| Exclusion/Objection Deadline | 120 days after entry of the Preliminary Approval Order |
| Claims Deadline | 120 days after entry of the Preliminary Approval Order |
| Deadline for Class Counsel's Application for Attorneys' Fees and Service Awards for Settlement Class Representative | 45 days before the Final Approval Hearing |
| Deadline for Motion in Support of Final Approval of Settlement | 21 days before the Final Approval Hearing |
| Final Approval Hearing | No earlier than 150 days after entry of the Preliminary Approval Order |

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter the accompanying proposed order, directing notice of the proposed Settlement to the Settlement Class and setting a hearing for the purpose of deciding whether to grant final approval of the Settlement.

## <u>RULE 3.01(g) CERTIFICATION</u>

Pursuant to Local Rule 3.01(g), the undersigned has conferred with counsel for the

Defendant and is authorized to represent that the Defendant does not oppose this motion.

Dated: May 6, 2020                              Respectfully submitted,

/s/ Jean Sutton Martin
Jean S. Martin (admitted *pro hac vice*)
Patrick A. Barthle II
Florida Bar No. 99286
Marcio W. Valladares
Florida Bar No. 986917
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Tel: (813) 559-4908
Fax: (813) 222-4795
jeanmartin@forthepeople.com
pbarthle@forthepeople.com
mvalladares@forthepeople.com

Tina Wolfson
Bradley K. King (admitted *pro hac vice*)
**AHDOOT & WOLFSON, PC**
10728 Lindbrook Drive
Los Angeles, California 90024
Tel: (310) 474-9111
Fax: (310) 474-8585
twolfson@ahdootwolfson.com
bking@ahdootwolfson.com

Abbas Kazerounian (admitted *pro hac vice*)
Jason A. Ibey (admitted *pro hac vice*)
**KAZEROUNI LAW GROUP, APC**
245 Fischer Avenue, Suite D1
Costa Mesa, CA 92626
Tel: (949) 612-9999
Fax: (800) 520-5523
ak@kazlg.com
jason@kazlg.com

*Counsel for Plaintiffs and the putative class*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on May 6, 2020, I electronically filed a true and correct copy of the foregoing unopposed motion with the Clerk of the Court using the CM/ECF system, which will send notification to all attorneys of record in this matter.

*/s/ Jean Sutton Martin*
Jean S. Martin (admitted *pro hac vice*)