UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| BREANDAN COTTER and JACK DINH, individually and on behalf of others similarly situated,<br><br>                Plaintiff,<br><br>    v.<br><br>CHECKERS DRIVE-IN RESTAURANTS, INC., a Delaware corporation,<br><br>                Defendant. | Case No. 8:19-cv-01386-VMC-CPT<br>Class Action |

**PLAINTIFFS' UNOPPOSED MOTION FOR FINAL
APPROVAL OF CLASS ACTION SETTLEMENT**

On May 6, 2020, Plaintiffs Breandan Cotter and Jack Dinh ("Plaintiffs") moved for preliminary approval of the proposed class action Settlement and for certification of the Settlement Class in the above captioned action ("Preliminary Approval Motion").[1] (Doc. 43). The Court preliminarily approved the Settlement on June 30, 2020. In granting preliminary approval, the Court found that the terms of the Settlement were "fair, reasonable, and adequate" and that the Class should be given notice. (Doc. 46) ("Preliminary Approval Order").

Plaintiffs now move for final approval of the class action settlement and for certification of the Settlement Class. As set forth in the declaration of Steven Weisbrot of Angeion Group, LLC implemented an extensive Court-approved Notice Program through print media and online ads which were designed to reach the Class. The Notice Program reached 70.3% percent of the class at an average frequency of 3.61 times. As further set forth in Mr. Weisbrot's declaration, the response from the class has been positive: as of October 22, 2020, a total of 10,044 claims have

---

[1] Unless otherwise noted, all capitalized terms are defined in the Settlement Agreement and Release ("Settlement"), which was previously filed at Doc. 43-1.

been received –with only 18 opt-outs received and no objections. See Declaration of Steven Weisbrot ("Weisbrot Decl."), attached hereto as **Exhibit 1**.

## I.    INTRODUCTION

This Action[2] was initiated following Defendant Checkers Drive-In Restaurants, Inc.'s ("Checkers") announcement that it was the subject of third-party cyberattacks involving malware variants which compromised its customers' personally identifiable information ("PII"). Plaintiffs allege, *inter alia*, that Checkers was negligent, breached its contracts with its customers, and violated state consumer protection laws when it failed to protect Plaintiffs' PII from being compromised in the Data Breach at issue. As a result of swift litigation, collaborative and targeted discovery and mediation, the Parties reached a hard-fought and arms-length resolution to this Action. Also, post-mediation confirmatory discovery was conducted which verified relevant factual details and indicated the present state of Defendant's Data Breach remediation efforts.

As discussed in detail in Plaintiffs' Preliminary Approval Motion (Doc. 43), the Settlement is fair, reasonable, and adequate, and represents an excellent result for the Settlement Class. The Settlement squarely addresses the issues raised in the Action and affords Class Members significant relief: tiered monetary relief to compensate Class Members for inconveniences and losses, and injunctive relief designed to better protect Defendant against similar data breaches that may again compromise consumers' PII. The Settlement compares favorably with settlements in similar litigation and was reached only after intensive, arms-length negotiations before a neutral and experienced mediator, Mr. Steven R. Jaffe, Esq. If approved, the Settlement will resolve all

---

[2] Plaintiff Cotter filed the complaint in the above-captioned action on June 6, 2019. (Doc. 1). On July 2, 2019, Jack Dinh filed a complaint in the Central District California in an action styled *Jack Dinh v. Checkers Drive-In Restaurants, Inc.*, No. 8:19-cv-01310 (C.D. Cal.). For purposes of settlement, the Parties agreed to consolidate these matters into the present *Cotter* action. On April 28, 2020, Plaintiffs filed an Amended Complaint adding Mr. Dinh as a named plaintiff. (Doc. 40).

claims arising out of the Data Breach and will provide Class Members with the precise relief this Action was filed to obtain. In light of the current pandemic that has upended the lives and finances of millions, immediate relief is now more valuable than ever.

Accordingly, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure and the Settlement Agreement, Plaintiffs respectfully request that the Court enter an order granting final approval of the settlement and finally certifying the Settlement Class.

## II.    SUMMARY OF THE LITIGATION

On May 29, 2019, Defendant confirmed that it was the subject of a massive breach in which its customers' PII had been stolen via malicious software installed by unauthorized third parties on the point-of-sale ("POS") systems at Checkers & Rally's restaurants owned and operated by franchisees of Defendant. Defendant stated that the malware was designed to collect information stored on the magnetic stripe of payment cards, including cardholder name, payment card number, card verification code and expiration date. Although dates vary by location, the malware at issue remained in the data systems of the from Checkers & Rally's restaurants December 2015 to October 2019, during which, the malware collected cardholders' names, payment card numbers, card verification codes, and expiration dates ("Payment Card Data" or "PCD"). As result, up to 1,500,000 payment card transactions were captured by data thieves.

Plaintiffs allege that Defendant failed to ensure that access to its data systems was reasonably safeguarded, failed to acknowledge and act upon industry warnings, failed to use proper security systems and protocols to detect and deter the type of attack that occurred, and failed to provide timely and adequate notice to Plaintiffs and other Class Members that their PII had been stolen, putting Plaintiffs and Class Members at a substantially increased risk of identity theft.

The Parties proceeded to conduct discovery.[3] Throughout the discovery process, the Parties engaged in arm's-length discussions regarding a potential settlement. The Parties agreed to and did retain Mr. Steven R. Jaffe, *Esq.*, a highly experienced mediator, to assist the Parties in settlement negotiations. (Declaration of Jean Sutton Martin, filed concurrently herewith ("Martin Decl.") ¶ 8, attached hereto as **Exhibit 2**).[4]

On November 21, 2019, the Parties, through their respective counsel, engaged in a full-day mediation session in-person before Mr. Jaffe. The negotiations were hard-fought throughout and the settlement process was conducted at arm's length. With the assistance of Mr. Jaffe, the Parties were able to reach a negotiated resolution to the Action on a class-wide basis that provides both injunctive and monetary relief to Class Members. (Doc. 24). Martin Decl. ¶ 11. On November 22, 2019, the Court was advised that the Parties had reached a final, comprehensive settlement (Doc. 24). During the ensuing months, the Parties continued the exchange of information and negotiations as to the final details of the Settlement Agreement. Defendant provided confirming documentation from payment card processors regarding the number of payment card transactions during the relevant windows of exposure at each of the restaurant locations affected by the Data

---

[3] Given the near identity of the *Cotter* and *Dinh* actions—including the underlying cyberattack, the claims asserted, the putative class definitions, and the legal teams—the Parties in both actions, during early Rule 26(f) conferences and other discussions, agreed to jointly conduct pre-mediation discovery and to jointly mediate the actions. (Docs. 10, 14, 18, 20, 22, and 23).

[4] Prior to the mediation, the Parties briefed their respective positions on the facts, claims, defenses, and assessments of the risk of litigation. The Parties also submitted a draft settlement term sheet prepared by Plaintiffs, which was then used as the basis for negotiations. Defendant also provided Plaintiffs with directed, informal discovery (660 pages) which included: (1) franchise agreements for several locations affected by the Data Breach, which are believed to be representative of the franchise agreements of the approximately 105 affected locations; (2) the number and identity of the affected restaurants; (3) information concerning what consumer contact information Checkers maintains; (4) preliminary information regarding the approximate number of payment card transactions during the Data Breach period; and (5) the Mandiant Report dated August 5, 2019 concerning the Data Breach. Checkers was also forthcoming about its current financial status and corporate affairs.

Breach as well as additional detail on the customer contact information it maintains from its customer loyalty program. Based on Plaintiffs' counsel's independent investigation of the relevant facts and applicable law, experience with other data breach cases, and the information provided by Defendant, Plaintiffs' counsel determined that the Settlement is fair, reasonable, adequate, and in the best interest of the Settlement Class.

The Parties jointly selected Angeion Group, LLC ("Angeion") to serve as the Settlement Administrator. SA ¶ 2.31. The Parties worked together to refine the details of the proposed Notice Program and each document comprising the Class Notice, which are embodied in the Settlement Agreement and the Exhibits attached thereto. At all times, the Parties' negotiations were adversarial, non-collusive, and conducted at arm's length.

## III.    SUMMARY OF THE SETTLEMENT TERMS

### A.    The Settlement Class

The preliminarily approved Settlement Class is defined as:

> All residents of the United States who made a credit or debit card purchase at any Affected Restaurant during the period of the Data Breach Incident.

SA ¶ 2.32; *see also,* Doc. 46, Preliminary Approval Order ¶ 2 (noting settlement class definition, including categories of persons excluded).

### B.    Compensation to Settlement Class Members

#### 1.    Cash Payment for Reimbursement of Out-of-Pocket Expenses

All Class Members who submit a valid and timely Claim Form and supporting documentation are eligible to receive up to $5,000 per Class Member for reimbursement for

documented out-of-pocket expenses incurred as a result of the Data Breach.[5] To receive payment for out-of-pocket expenses, the Class Member must complete the appropriate section of the Claim Form and provide documentation supporting a claim for out-of-pocket expenses, which could include but is not limited to, a receipt from an Affected Restaurant reflecting payment by a payment card during the Data Breach; a payment card statement reflecting a charge at an Affected Restaurant during the Data Breach; or, notification from a bank or financial institution that a payment card was compromised as a result of the Data Breach. SA ¶ 3.02(b).

To be considered valid, all Claim Forms and related documentation must be postmarked (or submitted electronically in accordance with the requirements for electronic submission of a Claim Form) on or before the Claims Deadline, which is the 120th day after the Preliminary Approval Date, i.e. October 28, 2020.[6] SA ¶¶ 2.08, 3.02(a).

### 2. Checkers and Rally's Restaurant Vouchers

In addition to payment for documented Out-of-Pocket Expenses, all Class Members who submit a valid and timely Claim Form and attest that they used a payment card at an affected Checkers location during the Data Breach are eligible to receive four (4) Checkers vouchers of $5.00 each, which are valid for one (1) year at any Checkers and Rally's restaurant, and which are freely and fully transferrable. SA ¶ 3.01.

---

[5] Class Members may claim reimbursement for one or more of the following: (i) costs and expenses spent addressing identity theft or fraud; (ii) losses caused by restricted access to funds (*e.g*., costs of taking out a loan, ATM withdrawal fees); (iii) preventative costs including purchasing credit monitoring, placing security freezes on credit reports, or requesting copies of credit reports for review; (iv) late fees, declined payment fees, overdraft fees, returned check fees, customer service fees, and/or card cancellation or replacement fees; (v) unauthorized charges on credit or debit card that were not reimbursed; (vi) other documented losses that were not reimbursed; and (vii) up to four hours of documented time spent for personal investigation and remediation relating to the Data Breach (calculated at the rate of $20.00 per hour). SA ¶ 3.02.

[6] The Preliminary Approval Order was entered by the Court on June 30, 2020.

C.    **Remedial Measures Attributable to the Settlement**

An additional benefit of the Settlement is the remedial measures that Checkers (and Affected Franchisees) agreed to adopt, continue, or maintain as a result of this Litigation (SA ¶¶ 4.01-02), which will benefit all Class Members regardless of whether or not they submit a Claim. These remedial measures include, but are not limited to, implementation of mandatory cybersecurity and data privacy training for all managers within its organization over the next two (2) years; and implementation of a solution that encrypts payment card data when it is read by the card acceptance device/point of sale system and routes the authorization message out to the payment card networks without the authorization message data being unencrypted on devices owned and managed by Checkers and/or Affected Franchisees. SA ¶ 4.01. In line with the Settlement, Checkers has represented that it has now already implemented point of sale (P2P) encryption at its restaurants.

D.    **Notice Program and Settlement Administration**

Pursuant to the Court's Preliminary Approval Order, the Parties implemented the Court-approved Notice Program in coordination with the approved Settlement Administrator, Angeion. *See* Doc. 46 ¶¶ 7-8; Weisbrot Decl. ¶¶ 5-15; Martin Decl. ¶ 16.

The Notice Program provided notice to all class members *via* the following methods: (i) publication notice in *USA Today*; (ii) an internet banner ad campaign on various social media and news media platforms, including Facebook; and (iii) a dedicated Settlement Website which provided relevant dates and deadlines pertaining to the Settlement, identified the Affected Restaurant locations, and made important case documents available for review and download. Weisbrot Decl. ¶¶ 5-11, 15. Angeion also established a toll-free help line to address Class Members' inquiries. Weisbrot Decl. ¶ 17.

Additionally, direct notice was provided via e-mail to Class Members registered with Defendant's Flav-R-Hood loyalty program. Weisbrot Decl. ¶¶ 12-14. Initially, direct email notice was provided to 700,480 email addresses from the Flav-R-Hood loyalty program. Weisbrot Decl. ¶ 13. As the claims process was ensuing, the Parties discussed and agreed upon a second effort of email notice to the Flav-R-Hood customers who had not yet filed claims. Martin Decl. ¶ 17. On September 14, 2020, Angeion completed a second direct email notice to 698.786 email addresses from the Flav-R-Hood loyalty program which were not matched with filed claims. Weisbrot Decl. ¶ 14.

### E.     Attorneys' Fees and Expenses and Service Awards

Plaintiffs will request a total for both attorneys' fees and expenses of $575,000. Checkers agrees to pay the fees and expenses of legal counsel for Plaintiffs in an aggregate amount not to exceed $575,000, subject to Court approval. SA ¶ 11.03. Plaintiffs will also request a service award for each of the two named Plaintiffs. Checkers agrees to pay a service award not to exceed $2,500 for each of the two named Plaintiffs, subject to approval by the Court. SA ¶ 11.02. Attorneys' fees, costs, expenses, and the service awards were negotiated only after all substantive terms of the Settlement were agreed upon by the Parties.

### F.     Confirmatory Discovery

Pursuant to the Settlement Agreement, SA ¶ 5.01, subsequent to the entry of Preliminary Approval, the Parties engaged in Confirmatory Discovery as to the investigative efforts and remedial measures undertaken by Defendant after the Data Breach. Martin Decl. ¶¶ 20-21. Plaintiffs serve special interrogatories to which Defendant responded with additional information as to its investigation of the Data Breach, the containment and remediation efforts taken in the wake of the breach, and the training and other business practice changes Defendant has

8

implemented in its corporate and franchise restaurants as a result of the Data Breach. Martin Decl. ¶ 20. Defendant also produced an additional Mandiant Report dated November 25, 2019 concerning the Data Breach. Martin Decl. ¶ 20. On October 8, 2019, Defendant presented a corporate representative pursuant to Fed. R Civ. P. 30(b)(6) to answer questions on the following topics: (a) how Checkers identified the Affected Restaurants; (b) how Checkers identified the number of payment card transactions subject to the Data Breach; (c) the process by which Checkers contacts its loyalty customers ("Flav-R-Hood" members); (d) the remedial measures Checkers has already taken, including the development, implementation, and cost of such measures; and (e) the cost of the training, business practice changes, and remedial measures undertaken by Checkers for its corporate and franchise restaurants as a result of the Settlement. Martin Decl. ¶ 21.

## IV.    ARGUMENT

### A.    Certification of the Settlement Class is Appropriate

This Court provisionally certified the Class in its Preliminary Approval Order finding that the Settlement Class meets the numerosity, commonality, typicality, and adequacy of representation requirements of Rule 23(a), and the predominance requirement of Rule 23(b).[7] *See* Fed. R. Civ. P. 23(a)(1)-(4), (b)(3); MANUAL FOR COMPLEX LITIG., § 21.632 (4th ed. 2004);

---

[7] *See* Doc. 46, Preliminary Approval Order ¶ 2 ("The Court provisionally finds, for settlement purposes only, that (a) the Settlement Class is so numerous that joinder of all Settlement Class Members would be impracticable; (b) there are issues of law and fact common to the Settlement Class; (c) the claims of the Representative Plaintiffs are typical of and arise from the same operative facts and seek similar relief as the claims of the Settlement Class Members; (d) the Representative Plaintiffs and Settlement Class Counsel will fairly and adequately protect the interests of the Settlement Class as the Representative Plaintiffs have no interests antagonistic to or in conflict with the Settlement Class and have retained experienced and competent counsel to prosecute this matter on behalf of the Settlement Class; (e) questions of law or fact common to Settlement Class Members predominate over any questions affecting only individual members; and (f) a class action and class settlement is superior to other methods available for a fair and efficient resolution of this controversy.")

*Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 620 (1997).  Since that time, there have been no developments that would alter this conclusion. Based on the facts and argument stated herein and for the reasons set forth in Plaintiffs' Preliminary Approval Motion (Doc. 43), the Settlement Class should now be finally certified.

### 1.    The Proposed Settlement Class Meets the Requirements of Rule 23(a)

#### a.    Numerosity

Numerosity requires that a "class [be] so numerous that joinder of all members is impractical." Fed. R. Civ. P. 23(a)(1). "While 'mere allegations of numerosity are insufficient,' Fed. R. Civ. P. 23(a)(1) imposes a 'generally low hurdle,' and 'a plaintiff need not show the precise number of members in the class.'" *Manno v. Healthcare Revenue Recovery Grp., LLC*, 289 F.R.D. 674, 684 (S.D. Fla. 2013) (citation omitted). Courts require only that the plaintiff provide "some evidence of the number of members in the purported class, or at least a reasonable estimate of that number." *Leszczynski v. Allianz Ins.*, 176 F.R.D. 659, 669 (S.D. Fla. 1997).

Here, Defendant identified in confirmatory discovery approximately 1,500,000 payment cards were affected by the Data Breach. Thus, the numerosity requirement is easily satisfied.

#### b.    Commonality

Commonality "requires the plaintiff to demonstrate that the class members 'have suffered the same injury,'" and that at least one common contention is "of such a nature that it is capable of classwide resolution." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2545 (2011) (citation omitted). The commonality requirement presents a low hurdle, as commonality does not require that all questions of law and fact raised be common. *Muzuco v. Re$ubmitIt, LLC*, 297 F.R.D. 504, 514 (S.D. Fla. 2013); *Dukes*, 131 S. Ct. at 2556 ("[F]or purposes of Rule 23(a)(2) '[e]ven a single [common] question' will do."). Rule 23(a)(2) requires "only that there be at least one issue whose

resolution will affect all or a significant number of the putative class members." *Sharf v. Fin. Asset Resolution, LLC*, 295 F.R.D. 664, 669 (S.D. Fla. 2014) (internal citations omitted).

Here, the commonality requirement of Rule 23(a)(2) is readily satisfied. Class Members are joined by common questions of law and fact that arise from the same event—the Data Breach. The critical issues posed by this litigation are: (1) whether the PII of Class Members was obtained by a third party without authorization due to compromised POS systems at Checkers restaurant locations; (2) whether Defendant had a duty to protect the PII of Class Members from disclosure; and (3) whether Class Members were injured by Defendant's failure to protect their PII. The central question behind every claim in this Action is whether Defendant adequately secured its consumers' PII. The answer to that question depends on common evidence that does not vary from class member to class member, and can be fairly resolved on a class-wide basis—whether through litigation or settlement—for all class members at once. These common issues converge at the center of Defendant's conduct in this Action, satisfying the commonality requirement. *See, e.g.*, *In re Countrywide Fin. Corp. Cust. Data Sec. Breach Litig.*, No. 3:08-MD-01998, 2009 WL 5184352, at *3 (W.D. Ky. Dec. 22, 2009) (commonality satisfied where all "class members had their private information stored in Countrywide's databases at the time of the data breach."); *In re Heartland Payment Sys., Inc. Cust. Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1059 (S.D. Tex. 2012) (commonality satisfied where answering "the factual and legal questions about Heartland's conduct will assist in reaching classwide resolution.").

### c.    Typicality

Typicality, "measures whether a significant nexus exists between the claims of the named representative and those of the class at large." *Hines v. Widnall*, 334 F.3d 1253, 1256 (11th Cir. 2003); Fed. R. Civ. P. 23(a)(3). A class representative's claims are typical of the claims of the

class if they "arise from the same event or pattern or practice and are based on the same legal theory." *Kornberg v. Carnival Cruise Lines, Inc*., 741 F.2d 1332, 1337 (11th Cir. 1984); *see also, Cooper v. S. Co*., 390 F.3d 695, 714 (11th Cir. 2004) ("Neither the typicality nor the commonality requirement mandates that all putative class members share identical claims …."). When the same course of conduct is directed at both the named plaintiff and the members of the proposed class, the typicality requirement is met. *Kennedy v. Tallant*, 710 F.2d 711, 717 (11th Cir. 1983).

Here, Plaintiffs' claims arise from the same event (i.e., the Data Breach), that gives rise to the claims of the other Class Members and are based on the same legal theory, *i.e*., that Defendant had a legal duty to protect Plaintiffs' and Class Members' PII. Because there is a "sufficient nexus" between the Plaintiffs' claims and the claims of Class Members, typicality is satisfied. *Hines*, 334 F.3d at 1256.

### d.  Adequacy

Rule 23(a)(4) is two-fold. It requires that: (1) the class representative "not possess interests which are antagonistic to the interests of the class," and (2) "the representative's counsel must be qualified, experienced, and generally able to conduct the proposed litigation." *CV Reit, Inc. v. Levy*, 144 F.R.D. 690, 698 (S.D. Fla. 1992) (citation omitted). Both components are satisfied. Plaintiffs' interests in this litigation are aligned with, and not antagonistic to, those of the Settlement Class, and Plaintiffs are represented by qualified and competent counsel. Martin Decl. ¶¶ 25-26. Defendant does not contest Plaintiffs' abilities to prosecute this action nor the qualification, experience or competence of Plaintiffs' counsel.

Plaintiffs provided their PII to Defendant and allege that their PII was compromised as a result of the Data Breach, just as the PII of the Settlement Class was also allegedly compromised. Indeed, Plaintiffs' claims are identical to the claims of the Settlement Class, and Plaintiffs and the

Settlement Class desire the same outcome in this Action. Plaintiffs have vigorously prosecuted this case thus far for the benefit of all Class Members. Plaintiffs have participated in the Action, reviewed pleadings, served discovery, and provided input in crafting and approving the Settlement.

In addition, proposed Settlement Class Counsel are experienced in nationwide class action litigation; with respect to data breach class actions, the undersigned are well recognized practice leaders. Martin Decl. ¶ 25. Moreover, the adequacy requirement is satisfied because Plaintiffs and their counsel have devoted considerable time and resources to this litigation and have shown a deft understanding of the issues in this Action.

### 2.    The Predominance and Superiority Requirements of Rule 23(b)(3) Are Met

Certification under Rule 23(b)(3) requires that: (1) questions of law and fact common to members of the class predominate over any questions affecting only individuals; and (2) the class action mechanism is superior to other available methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3).

### a.    Predominance

Rule 23(b)(3)'s predominance requirement focuses primarily on whether a defendant's liability is common enough to be resolved on a class basis, *see Dukes*, 131 S. Ct. at 2551–57, and whether the proposed class is "sufficiently cohesive to warrant adjudication by representation," *see Amchem*, 521 U.S. at 623. Common issues of fact and law predominate in a case "if they have a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief." *BellSouth Telecomms., Inc.*, 275 F.R.D. at 644 (citing *Klay v. Humana, Inc.*, 382 F.3d 1241, 1255 (11th Cir. 2004)); *see also, Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1179 (11th Cir. 2010) (noting that "[t]he relevant inquiry [is] whether questions of liability to the class . . . predominate over . .

. individual issues relating to damages. . . ."). Predominance does not require that all questions of law or fact be common, but rather, that a significant aspect of the case "can be resolved for all Settlement Class Members of the class in a single adjudication." *In re Checking*, 275 F.R.D. at 660. "When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (quoting 7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure §1778, 123–124 (3d ed. 2005)).

Common issues predominate here because the central liability question in this case— whether Defendant failed to safeguard Plaintiffs' PII, like that of every other Class Member—can be established through generalized evidence. *See Klay*, 382 F.3d at 1264 ("When there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class member's individual position, the predominance test will be met."). Several case-dispositive questions can be resolved identically for all members of the Settlement Class, such as whether Defendant had a duty to exercise reasonable care in safeguarding, securing, and protecting the PII of Plaintiffs and Class Members and whether Defendant breached that duty.

Numerous courts have recognized that these types of common issues arising from a data breach predominate over individualized issues. *See, e.g., In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*, No. 3:08-md-1998, 2009 WL 5184352, at *6-7 (W.D. Ky. Dec. 22, 2009) (finding predominance where proof would focus on data breach defendant's conduct both before and during the theft of class members' personal information); *In re Heartland Payment Sys., Inc.*

14

*Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1059 (S.D. Tex. 2012) (finding predominance where "several common questions of law and fact ar[ose] from a central issue: Heartland's conduct before, during, and following the data breach, and the resulting injury to each class member from that conduct"). Accordingly, the common questions of fact and law that arise from Defendant's conduct predominate over any individualized issues.

### b.  Superiority

Finally, a class action is superior to other methods available to fairly, adequately, and efficiently resolve the claims of the proposed Settlement Class. As courts have historically noted, "[t]he class action fills an essential role when the plaintiffs would not have the incentive or resources to prosecute relatively small claims in individual suits, leaving the defendant free from legal accountability." *In re Checking*, 286 F.R.D. at 659. "The inquiry into whether the class action is the superior method for a particular case focuses on 'increased efficiency.'" *Agan v. Katzman & Korr, P.A.*, 222 F.R.D. 692, 700 (S.D. Fla. 2004) (quoting *Sikes v. Teleline, Inc*., 281 F.3d 1350, 1359 (11th Cir. 2002)). Factors the Court may consider are: (1) the interests of members of the class in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class.

Here, resolution of numerous claims in one action is far superior to individual lawsuits, because it promotes the adjudication of claims in a manner that is consistent, efficient, fair, and in conformity with Due Process. *See* Fed. R. Civ. P. 23(b)(3). Absent class treatment in the instant case, each Class Member will be required to present the same or substantially similar legal and factual arguments, in separate, duplicative proceedings, the result of which would be a multiplicity

of trials conducted at enormous expense to both the judiciary and the litigants. This is particularly the case where many of the 105 affected restaurant locations are owned and operated by different franchisees. There is also the possibility that individual claims would lead to inconsistent results.

Moreover, there is no indication that Class Members have an interest in individual litigation or an incentive to pursue their claims individually, given the amount of damages likely to be recovered relative to the high costs of prosecuting each individual action to final judgment. *See In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 700 (S.D. Fla. 2004) (class actions are "particularly appropriate where . . . it is necessary to permit the plaintiffs to pool claims which would be uneconomical to litigate individually").

Accordingly, the requirements for certification under Rule 23(a) and (b) are satisfied.

### B.    Plaintiffs' Counsel Should Be Appointed as Settlement Class Counsel

Under Rule 23, "a court that certifies a class must appoint class counsel . . . [who] must fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B). In making this determination, the court must consider the proposed class counsel's: (1) work in identifying or investigating potential claims; (2) experience in handling class actions or other complex litigation and the types of claims asserted in the case; (3) knowledge of the applicable law; and (4) resources committed to representing the class. Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv).

As discussed herein, and as fully explained in Jean Sutton Martin's Declaration, proposed Settlement Class Counsel have extensive experience prosecuting similar class actions and other complex litigation. Martin Decl. ¶ 25. The proposed Settlement Class Counsel have diligently investigated and efficiently prosecuted the claims in this matter, dedicated substantial resources toward the endeavor, and have successfully and fairly negotiated the Settlement of this matter to the benefit of Plaintiffs and the Settlement Class.  Martin Decl. ¶¶ 6-13, 16-17, 19-21. Accordingly,

Plaintiffs request that the Court appoint Tina Wolfson and Bradley K. King of Ahdoot & Wolfson, PC, Jean Sutton Martin of Morgan & Morgan, and Abbas Kazerounian, and Jason A. Ibey of Kazerouni Law Group, APC as Settlement Class Counsel.

### C.    The Settlement is Fair, Reasonable, and Adequate

The procedure for review of a proposed class action settlement is a well-established, two-step-process. Alba & Conte, 4 Newberg on Class Actions, §11.25, at 38–39 (4th ed. 2002) (hereinafter "Newberg on Class Actions"). In the first step, the Court determines, as it did here, whether the proposed settlement should be preliminarily approved. *See* David F. Herr, *Annotated Manual for Complex Litigation* § 21.632 (4th ed. 2004). In the second step, after hearing from any objectors and being presented with declarations and materials to support the fairness of the settlement, the Court makes a final decision whether the settlement should be finally approved. *See id.* §§ 21.633-35. In deciding whether to approve the Settlement, the Court will analyze whether it is "fair, adequate, reasonable, and not the product of collusion." *Leverso v. Lieberman*, 18 F.3d 1527, 1530 (11th Cir. 1994); *see also Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984). The Court's "judgment is informed by the strong judicial policy favoring settlement as well as by the realization that compromise is the essence of settlement." *Wilson*, 2016 WL 457011, at *6 (quoting *Nelson v. Mead Johnson & Johnson Co.*, 484 Fed. App'x 429, 434 (11th Cir. 2012)).

### 1.    Legal Standard for Approval of a Settlement

Revisions to Rule 23(e)—effective on December 1, 2018—require the Court to conduct a detailed analysis to determine whether a settlement is fair, reasonable and adequate. The Advisory Committee noted, however, that "[t]he goal of this amendment is not to displace any factor previously considered in any given Circuit. *See also*, 4 Newberg on Class Actions § 13:58 (5th

ed.) ("[V]arious pre-existing legal factors not captured by amended Rule 23(e)(2)'s list of factors may prove relevant in particular cases.").

Approval is proper under the amended Rule 23(e)(1)(B)(i) upon a finding that the settlement is "fair, reasonable, and adequate" after considering whether:

> (A) the class representatives and class counsel have adequately represented the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account:
> > (i) the costs, risks, and delay of trial and appeal;
> > (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
> > (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
> > (iv) any agreement required to be identified under Rule 23(e)(3); and
> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e).

The revised rule reflects factors already used in the Eleventh Circuit in analyzing the fairness, reasonableness and adequacy of a class settlement under Rule 23(e):

> 1. the existence of fraud or collusion behind the settlement;
> 2. the complexity, expense, and likely duration of the litigation;
> 3. the stage of the proceedings and the amount of discovery completed;
> 4. the probability of the Class Representative's success on the merits;
> 5. the range of possible recovery; and
> 6. the opinions of the class counsel, class representative, and the substance and amount of opposition to the settlement

*Montoya v. PNC Bank, N.A.*, No. 14-20474, 2016 WL 1529902 at *8 (S.D. Fla. April 13, 2016), (citing *Leverso*, 18 F.3d at 1530 n.6; *Bennett*, 737 F.2d at 986). The analysis of these factors, set forth below, shows this Settlement to be eminently fair, adequate, and reasonable.

**2.    The Proposed Settlement Satisfies the Standard for Final Approval**

**a.    Adequacy of Representation**

As explained above, Plaintiffs have retained attorneys with extensive experience prosecuting class actions, particularly data breach and data disclosure cases, throughout the nation

and who have zealously represented the Class at all times. In addition, there is no conflict or any antagonism between Plaintiffs and the Settlement Class; to the contrary, Plaintiffs have vigorously prosecuted this case for the benefit of all members of the Settlement Class.

**b.    Arm's-Length Negotiations**

The Settlement resulted from arm's-length negotiations between experienced counsel with an understanding of the strengths and weaknesses of their respective positions in this Action, under the supervision of a neutral and experienced mediator. These circumstances weigh in favor of approval. *See Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360, 1384 (S.D. Fla. 2007) (concluding that class settlement was not collusive in part because it was overseen by "an experienced and well-respected mediator"); *Lipuma*, 406 F. Supp. 2d at 318–19; MANUAL FOR COMPLEX LITIG. at §30.42 ("A presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery.") (internal quotation marks omitted).

Additionally, the Parties spent significant time negotiating the terms of the final written Settlement Agreement which is now presented to the Court for final approval. Martin Decl. ¶ 13. There is no doubt this Settlement was at all times negotiated at arms-length, and the context in which the Settlement was reached confirms that it as the product of informed negotiations between adverse parties. It therefore carries a presumption of fairness.  Where there "is no evidence of any kind that the parties or their counsel have colluded or otherwise acted in bad faith in arriving at the terms of the proposed settlement . . . counsel's informed recommendation of the agreement is persuasive that approval is appropriate."  *Strube v. Am. Equity Inv. Life Ins. Co.*, 226 F.R.D. 633, 703 (M.D. Fla. 2005).  Further, Class Counsel have significant experience in nationwide class action litigation and data breach class actions in particular, and are in favor of this proposed Settlement and recommend its approval.

19

#### c.    The Relief Provided for The Class Is Adequate

The relief offered by the Settlement (both monetary and injunctive) is adequate considering the risks of continued litigation. Although Plaintiffs are confident in the merits of their claims, the risks involved in prosecuting a class action through trial cannot be disregarded. Plaintiffs' claims would still need to survive likely motion practice (*e.g.*, a motion to dismiss and motion for summary judgment) and succeed at class certification.

Almost all class actions involve a high level of risk, expense, and complexity, which is one reason that judicial policy so strongly favors resolving class actions through settlement. "[T]here is an overriding public interest in settling class action litigation, and it should therefore be encouraged." *In re Warfarin*, 391 F.3d at 535; *see also In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992) ("Public policy strongly favors the pretrial settlement of class action lawsuits"); *Warren v. City of Tampa*, 693 F. Supp. 1051, 154 (M.D. Fla. 1998). This is not only a complex case, but it is in an especially risky field of litigation: data breach litigation. *See, e.g., In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*, 2010 WL 3341200, at *6 (W.D. Ky. Aug. 23, 2010) (approving data breach settlement, in part, because "proceeding through the litigation process in this case is unlikely to produce the plaintiffs' desired results").

Data breach cases, such as this one, are especially risky, expensive, and complex. *See In re Sonic Corp. Customer Data Sec. Breach Litig.*, No. 1:17-md-2807, 2019 WL 3773737, at *7 (N.D. Ohio Aug. 12, 2019) ("Data breach litigation is complex and risky. This unsettled area of law often presents novel questions for courts. And of course, juries are always unpredictable."). Although data breach law is continuously developing, data breach cases are still relatively new, and courts around the country are still grappling with what legal principles apply to the claims. *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 315 (N.D. Cal. 2018) (noting that "many of the legal

issues presented in [] data-breach case[s] are novel"). Because the "legal issues involved in [in data breach litigation] are cutting-edge and unsettled … many resources would necessarily be spent litigating substantive law as well as other issues." *In re Target Corp. Customer Data Security Breach Litig.*, No. 14-2522 (PAM/JJK), 2015 WL 7253765, at *2 (D. Minn. Nov. 17, 2015). Through the Settlement, Plaintiffs and Class Members gain significant benefits without having to face further risk.

While Plaintiffs believe that they would prevail on their claims, there is little directly analogous precedent to rely upon. Beyond the merits, class certification is challenging in any case. Further, while Plaintiffs believe that they would be able to obtain certification outside of a settlement context and maintain certification through trial, this is not certain. Any potential certification would also be subject to later appeal and potential reversal. The cost of trial and any appeals would be significant and would considerably delay the resolution of this litigation without the guarantee of any relief. *Id.*

Furthermore, the outcome of this Settlement should be considered not only as favorable as other payment card data breach class action settlements, but should be viewed more favorably in light of the fact that multiple other payment card data breach cases have resulted in no recovery for the plaintiff or class members. *See, e.g., Dugas v. Starwood Hotels & Resorts Worldwide, Inc.*, 3:16-cv-00014-GPC-BLM (S.D. Cal.), Doc. 56 (order dismissing payment card data breach case) (July 11, 2017); *Whalen v. Michaels Stores, Inc.*, 689 F. App'x 89 (2d Cir. 2017) (order affirming dismissal of payment card data breach case).[8]

---

[8]  The same is true for data breach cases involving solely PII, and no PCD. *See, e.g., Storm v. Paytime, Inc.*, 90 F. Supp. 3d 359, 368 (M.D. Pa. 2015) (dismissed for lack of standing as plaintiffs failed to demonstrate that they had suffered actual harm, such as, identity theft); *Longenecker-Wells v. Benecard Servs. Inc*, 658 F. App'x 659, 663 (3d Cir. 2016) (negligence claim barred by

The Settlement is a claims-made settlement that will provide Class Members with significant and timely benefits which compare favorably to what Class Members could recover were they to secure a favorable judgment at trial. In the experience of proposed Class Counsel, the monetary relief provided by this Settlement is an outstanding result, and is fair and reasonable in light of reported average out-of-pocket expenses due to a data breach.[9] *See e.g., Jackson et al. v. Wendy's International, LLC*, No. 6:16-cv-21-PGB-DCI (M.D. Fla.) (Doc. 157) (approving settlement that provides class members reimbursement of documented losses of up to $5,000); *Hapka v. CareCentrix, Inc.*, No. 2:16-CV-02372-KGG, 2018 WL 1879845, at *3 (D. Kan. Feb. 15, 2018) ("The Settlement addresses past harms through reimbursement of Out-of-Pocket Losses or the alternative minimum $200 payment for tax fraud and also helps Settlement Class Members protect against future harm through the Credit Monitoring Services.").

In addition, the monetary benefits provided by the Settlement are in line with, or superior to, those of other settlements in data breach class actions that have been approved by other courts. *See e.g., Bray, et. al. v. GameStop Corp.*, No. 1:17-cv-01365, (D. Del. Dec. 19, 2018) (approving claims made settlement that would reimburse up to $235/claim including, *inter alia*, expenses for lost time, payment for each card on which fraudulent charges incurred, costs of obtaining credit report, costs of credit monitoring and identity theft protection, as well as up to $10,000/claim for extraordinary expenses); *T.A.N. v. PNI Digital Media, Inc*., No. 2:16-cv 00132, Doc. 46 (S.D. Ga.

---

economic loss doctrine and breach of implied contract dismissed for failure to plead sufficient allegations).

[9] For individuals who experienced actual identity theft, a 2014 Congressional Report stated that these victims incurred an average of $365.00 in expenses in dealing with the fraud. *See* Kristin Finklea, Congressional Research Service, *Identity Theft: Trends and Issues* (January 16, 2014), p. 2, available at https://fas.org/sgp/crs/misc/R40599.pdf (last visited October 13, 2020).

Oct. 20, 2017) (approving settlement for reimbursement up to $250/claim for out-of-pocket expenses plus up to $10,000/claim for reimbursement of extraordinary expenses).[10]

Here, the $20.00 in Vouchers (4 Vouchers x. $5.00) with simply an attestation of use of a payment card at an Affected Restaurant during the Data Breach is a novel benefit not found in many, if any, data breach settlements. Additionally, the reimbursement for documented out-of-pocket losses due to fraud of up to $5,000 with compensation for time spent investigating and remediating fraud of up to $80.00 ($20.00/hour) compare favorably to past data breach settlements. Once the separately funded costs of notice and administration, and attorneys' fees, costs, and expenses and service awards are factored in, that comparison only heightens.

The injunctive relief provided for in this Settlement is also significant and ensures the rights of the class because it swiftly commits Defendant, and its Franchisee restaurants, to certain security measures and protection of personal information. These remedial measures are attributable to the Settlement and are squarely consistent with the claims on which Plaintiffs have focused in the litigation. These commitments will ensure the adequacy of Defendant's data security practices, and will provide ongoing protection for any Class Members' information remaining on the data system of Checkers and its Affected Franchisees, as well as providing protection for consumers in

---

[10] *See also, In re the Home Depot, Inc., Customer Data Sec. Breach Litig*., No. 1:14-MD-02583 TWT, 2016 WL 6902351, at *6 (N.D. Ga. Aug. 23, 2016) (approving $13 million fund, maximum of $10,000 in expense reimbursement, documented time of 5 hours at $15/hour and up to 2 hours of self-certified time only if had also documented losses with class size of 40 million consumers); *Target*, 2015 WL 7253765, at *1 (approving settlement that provided $10 million to pay for losses and time spent as a result of Target data breach, and injunctive relief with class size of 100 million consumers); *In re Heartland Payment Sys., Inc. Customer Data Security Breach Litig*., 851 F. Supp. 2d 1040, 1048 1069 (S.D. Tex. 2012) (approving settlement that provided up to $2.4 million to pay for out-of-pocket losses); *In re Countrywide Financial Corp. Customer Data Security Breach Litig*., No. 3:08-MD-01998, 2009 WL 5184352, at *1-4 (W.D. Ky. Dec. 22, 2009). (approving settlement that provided up to $1.5 million to pay out-of-pocket costs, up to $5 million to pay identity theft losses, and 2 years of free credit monitoring services).

the future. Without this Settlement, there is little Class Members could do individually to achieve similar promises from Checkers regarding data security going forward. The Settlement is calculated to ensure that Checkers not only employs the necessary, immediate resources to address existing data security vulnerabilities, but also employs the consistent best practices and accountabilities needed for long-term, proactive data security.

The Settlement benefits are therefore fair, adequate and reasonable compared to the range of possible recovery.

### d.    The Settlement Treats Class Members Equitably

Finally, Amended Rule 23(e) requires that the Settlement "treat[] class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). Here, the Settlement treats all Class Members equitably relative to one another because all who have been damaged are eligible to receive reimbursement based on expenses incurred, not on any unequitable basis. SA ¶ 3.02. The Settlement's proposed relief is proportional to damages incurred by each Class Member. *Id.*

### D.    The Opinions of Class Counsel, Class Representatives, and Absent Settlement Class Members Favor Approval of the Settlement

The Court should also give "great weight to the recommendations of counsel for the parties, given their considerable experience in this type of litigation." *Warren*, 693 F. Supp. at 1060; *see also, In re Domestic Air Transp. Antitrust Litig.,* 148 F.R.D. at 312–13 ("In determining whether to approve a proposed settlement, the Court is entitled to rely upon the judgment of the parties' experienced counsel. '[T]he trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel.'") (citations omitted).

> This Court, like others, considers the reaction of the class, as well as the reaction of the various state attorney generals and regulators, to the proposed settlement to be an important indicator as to its reasonableness and fairness. Obviously, a low number of objections suggests that the settlement is reasonable, while a high number of objections would provide a basis for finding that the settlement was unreasonable.

24

*Howard Braynen, et al. v. Nationstar Mortgage, LLC, et al.*, 2015 WL 6872519 (S.D. Fla. 2015) (internal citations and quotation marks omitted).

Here, Class Counsel have substantial experience prosecuting large, complex consumer class actions. Martin Decl. ¶ 25. After discovery, independent fact investigation, and mediation before a well-qualified and experienced mediator, Class Counsel are confident that the Settlement provides significant relief to the Class, and is in the best interests of the Class. Martin Decl. ¶ 27. Class Counsel heartedly endorses the Settlement. Additionally, the reaction of the Settlement Class has been positive. To date, there are zero objections, only 19 opt-outs, and 10,044 claims have been received. These are powerful indicia that the Settlement is fair, reasonable, and adequate and deserves final approval. *See Hall v. Bank of America, N.A.*, No. 1:12-cv-22700, 2014 WL 7184039, at *5 (S.D. Fla. Dec. 17, 2014) (noting where objections from settlement class members "equates to less than .0016% of the class" and "not a single state attorney general or regulator submitted an objection," "such facts are overwhelming support for the settlement and evidence of its reasonableness and fairness"); *Hamilton v. SunTrust Mortg. Inc.*, No. 13-60749, 2014 WL 5419507, at *4 (S.D. Fla. Oct. 24, 2014) (where "not a single state attorney general or regulator submitted an objection," and there were few objections to the class settlement, "such facts are overwhelming support for the settlement").

**V.    CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court enter the accompanying Final Order and Judgment Certifying the class, approving the Class Settlement, and dismissing the action with prejudice.

## <u>RULE 3.01(g) CERTIFICATION</u>

Pursuant to Local Rule 3.01(g), the undersigned has conferred with counsel for the Defendant and is authorized to represent that the Defendant does not oppose this motion.


Dated: October 23, 2020                    Respectfully submitted,

                                          /s/ Jean Sutton Martin
                                          Jean S. Martin (admitted *pro hac vice*)
                                          Patrick A. Barthle II
                                          Florida Bar No. 99286
                                          Marcio W. Valladares
                                          Florida Bar No. 986917
                                          **MORGAN & MORGAN**
                                          **COMPLEX LITIGATION GROUP**
                                          201 N. Franklin Street, 7th Floor
                                          Tampa, Florida 33602
                                          Tel: (813) 559-4908
                                          Fax: (813) 222-4795
                                          jeanmartin@forthepeople.com
                                          pbarthle@forthepeople.com
                                          mvalladares@forthepeople.com

                                          Tina Wolfson
                                          Bradley K. King (admitted *pro hac vice*)
                                          **AHDOOT & WOLFSON, PC**
                                          10728 Lindbrook Drive
                                          Los Angeles, California 90024
                                          Tel: (310) 474-9111
                                          Fax: (310) 474-8585
                                          twolfson@ahdootwolfson.com
                                          bking@ahdootwolfson.com

                                          Abbas Kazerounian (admitted *pro hac vice*)
                                          **KAZEROUNI LAW GROUP, APC**
                                          245 Fischer Avenue, Suite D1
                                          Costa Mesa, CA 92626
                                          Tel: (949) 612-9999
                                          Fax: (800) 520-5523
                                          ak@kazlg.com

Jason A. Ibey (admitted *pro hac vice*)
**KAZEROUNI LAW GROUP, APC**
321 N Mall Drive, Suite R108
St. George, Utah 84790
Tel: (949) 612-9999
Fax: (800) 520-5523
jason@kazlg.com

*Counsel for Plaintiffs and the putative class*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 23, 2020 I electronically filed a true and correct copy of the foregoing unopposed motion with the Clerk of the Court using the CM/ECF system, which will send notification to all attorneys of record in this matter.

<u>*/s/ Jean Sutton Martin*</u>
Jean S. Martin (admitted *pro hac vice*)